541 F.Supp. 805 (1982)
Paula RENFROE, and Marsha Smith, Plaintiffs,
v.
ELI LILLY & COMPANY, et al., Defendants.
No. 78-856C(3).
United States District Court, E. D. Missouri, E. D.
June 30, 1982.
*806 Shook, Hardy & Bacon, Lane D. Bauer, Harvey L. Kaplan, Kansas City, Mo., for Eli Lilly defendant.
Stephen H. Ringkamp, Hullverson, Hullverson & Frank, Inc., James E. Hullverson, St. Louis, Mo., for plaintiffs.

MEMORANDUM
FILIPPINE, District Judge.
This matter is before the Court on the joint motion of certain of the defendants for summary judgment in defendants' favor on all counts of plaintiffs' complaint. The motion has now been adopted by all defendants except Comark, Inc. As grounds for the motion, defendants claim that plaintiffs' causes of action are barred by the California and/or Ohio statutes of limitations made applicable to plaintiffs' claims by the Missouri borrowing statute, § 516.190, R.S.Mo.1978. The borrowing statute reads as follows:
Whenever a cause of action has been fully barred by the laws of the state, territory, or country in which it originated, said bar shall be a complete defense to any action thereon, brought in any courts of this state.
Defendants argue that the word "originated" as used in the borrowing statute, has been construed to mean "accrued"; and that under the standards for accrual of a cause of action set forth in § 516.100, R.S. Mo.1978, plaintiff Renfroe's causes of action accrued in California by the fall of 1976 and plaintiff Smith's causes of action accrued in Ohio or California by April, 1976. Thus, defendants contend, plaintiffs' claims are barred by the applicable one-year California statute of limitations and/or the applicable two-year Ohio statute of limitations. Defendants apparently concede that the applicable Missouri limitations period would be five years. Section 516.120, R.S.Mo.1978.
Plaintiffs argue in response to the motion that the plaintiffs' causes of action "originated" in Missouri, and hence that the borrowing statute does not apply. Plaintiffs also argue, alternatively, that the applicable California statute of limitations is six years, and that the running of the statute(s) of limitations was tolled while the defendants were absent from the states of California and Ohio.
The complaint in this action was filed August 17, 1978. The complaint alleges that plaintiff Renfroe developed adenocarcinoma of the cervix, and that plaintiff Smith developed squamous cell carcinoma of the cervix, as a result of their in utero exposure to certain drugs (hereinafter collectively referred to as DES) manufactured by the defendants. Plaintiffs have allegedly undergone surgery to remove the cancer. The complaint states claims against the defendants *807 for negligence per se, negligence, breach of express and implied warranty, fraud and deceit, strict liability, and conspiracy to defraud and deceive. Plaintiffs each seek recovery for pain, for medical expenses, lost wages, and the loss of ability to bear children, as well as punitive damages.
This case being a diversity action, the Court must apply the limitations rule which would be applied by a Missouri court. Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). Missouri regards limitations issues as procedural issues, governed by Missouri law. Keaton v. Crayton, 326 F.Supp. 1155, 1157-58 (W.D. Mo.1969). The Missouri borrowing statute adopts a foreign state's statute of limitations for a cause of action which "originated" in the foreign state, if the foreign statute provides a shorter period than the otherwise applicable Missouri statute of limitations. Farthing v. Sams, 296 Mo. 442, 247 S.W. 111 (1922).
The initial question, then, is where the plaintiffs' claims "originated." Defendants, as noted above, argue that "originated," as used in § 516.190, means "accrued." Plaintiffs argue that "originated" refers to the place where defendants' tortious conduct last directly affected the plaintiffs, that is, plaintiffs' place of birth.
Missouri's use of the word "originated" in its borrowing statute is apparently unique; the great majority of borrowing statutes of general applicability refer to the place where the cause of action "arose," and several others refer to the state where the cause of action "accrued." Ester, Borrowing Statutes of Limitation and Conflict of Laws, 15 U.Fla.L.Rev. 33, 79-80 app. (1962) (hereinafter Ester). As far as this Court's research has disclosed, Missouri cases construing the borrowing statute have for the most part used the words "arose", "accrued" and "originate" interchangeably, without discussion. The only law review article which has been written about the borrowing statute, which was enacted in 1899, described its effect in this manner: "the Missouri courts [now] hold that the time limited by the law of the place where the cause of action arose is the law which governs the right of the plaintiff to maintain his action in Missouri." Haley, When is a Foreign Cause of Action Barred by Limitations in Missouri?, 21 St. Louis L.Rev. 43, 45 (1935) (emphasis added) (footnote omitted).
The Court believes that, at least with reference to claims premised on personal injury, such as plaintiffs' claims, § 516.190 must be construed in the same manner as borrowing statutes which refer to the place where the cause of action "arose" or "accrued." The inquiry under any such statute is simply the place where the cause of action came into being, or, if the various elements of a cause of action did not develop simultaneously, where the final element of the cause of action came into being. Of course, in the vast majority of cases premised on personal injury, the elements of the plaintiff's cause of action have developed simultaneously, and hence the need for detailed analysis to determine the place where the cause of action originated or came into being, has been very limited. See, e.g., Ester, supra, stating that "[t]he courts unanimously hold that a cause of action sounding in tort arises in the jurisdiction where the last act necessary to establish liability occurred," and equating that location with the place "in which injury is received." 15 U.Fla.L.Rev. at 47-48. Cf. McIndoo v. Burnett, 494 F.2d 1311, 1313 (8th Cir. 1974) (stating, in an automobile accident case, that "the plain meaning of the [Missouri borrowing statute] is that where the tort takes place in a foreign jurisdiction Missouri will adopt" the foreign limitations period.) Although conflict of law principles could be used to determine where a cause of action arises or originates, see Comment, Choice of Law: Statutes of Limitation in the Multistate Products Liability Case, 48 Tul.L.Rev. 1130 (1974), Mack Trucks, Inc. v. Bendix-Westinghouse Automotive Air Brake Co., 372 F.2d 18, 21-26 (3d Cir. 1966) (dissenting opinion), cert. denied, 387 U.S. 930, 87 S.Ct. 2053, 18 L.Ed.2d 992 (1967), the Missouri cases cited by defendants *808 amply demonstrate that Missouri courts eschew such an approach, holding instead that the borrowing statute embodies a particular choice of law directive which the courts are not free to modify. See, e.g., Trzecki v. Gruenewald, 532 S.W.2d 209 (Mo.1976) (en banc); Girth v. Beaty Grocery Co., 407 S.W.2d 881 (Mo.1966).
Having established that the relevant inquiry is simply when (and thus where), see Mack Trucks, supra, (majority opinion), the plaintiffs' causes of action came into being, or arose, or accrued, or originated, the Court must now determine how Missouri cases have defined that point in cases of the nature of the instant case. The Court agrees with defendants that this inquiry must be undertaken in light of § 516.100, R.S.Mo.1978, which provides in part that a "cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained." Section 516.100 applies, by its terms, to a range of sections including the borrowing statute. The Court observes that the inquiry as to when plaintiffs' causes of action accrued is the same as the inquiry as to when the Missouri statute of limitations, if applicable, would have begun to run. 51 Am.Jur.2d, Limitation of Actions § 107 (1970); Jepson v. Stubbs, 555 S.W.2d 307 (Mo.1977) (en banc).
One of the early Missouri cases dealing with a situation comparable to that alleged in the case at bar was Clohesy v. Century Electric Co., 142 S.W.2d 780 (Mo.App.1940). Clohesy had worked for the defendant as a grinder from 1922 to 1926, and allegedly contracted pneumoconiosis as a result of breathing metal dust during that time; plaintiff alleged however that the illness was not ascertainable until 1934, the year in which he filed his complaint. Defendant claimed on appeal that the plaintiff's claims were barred by the five-year statute of limitations, but the appellate court, reviewing the record in light of what is now § 516.100, found that although the plaintiff had suffered sinus trouble as early at 1925 and was treated for a bronchial condition in 1929, there was enough evidence in the record that reasonable minds could differ as to whether plaintiff had developed pneumoconiosis, and if so, if the pneumoconiosis was ascertainable more than five years before he filed suit. The Court noted the testimony of plaintiff's medical expert that the pneumoconiosis did not show up in x-rays taken during the years 1929 through 1933.
Clohesy was relied on in a comparable situation in Krug v. Sterling Drug, Inc., 416 S.W.2d 143 (Mo.1967). Plaintiff in Krug had been prescribed a drug for an arthritic condition. She began to take the drug in 1953; in 1955, she noticed a blurring of her eyesight, and by 1957, her vision was sometimes "fuzzy." However, she continued to take the drug by prescription until 1961 or 1962, by which time she had lost her central vision. Suit was filed in 1963 and the defendant drug manufacturer claimed that it was barred by the five-year statute of limitations. There was testimony that plaintiff's doctor was not aware of the cause of her worsening eyesight until certain medical literature was published in 1961, and hence that plaintiff did not know the cause of her condition until that year. The Court of Appeals held that plaintiff's suit was not untimely as a matter of law, either because defendant's negligence in failing to warn plaintiff's doctor of the hazards of the drug could be said to have continued until 1961 or because it was not clear that plaintiff's injury was capable of ascertainment more than five years prior to the institution of her action, and plaintiff did not know the cause of her injury until 1961.
Thus, it may be said that "[t]he rule set out in § 516.100, ... that the damage be sustained and capable of ascertainment is ... a rule of reason, turning on the time when the damage can reasonably be discovered or made known so that the right to commence an action arises." West v. Atlas Chemical Industries, Inc., 264 F.Supp. 697, 700 (E.D.Mo.1966). Hence, it is evident that plaintiffs' claims did not originate or *809 arise at least until plaintiffs' physical injuries reasonably could have been discovered. (This requirement in itself forecloses the plaintiffs' theory of the time of accrual of their claims, because, as the facts discussed below make clear, the fact that plaintiffs would develop cancer as a result of their exposure to DES was not reasonably discoverable until long after their births.)
However, in a case such as this, it could be most unfair to hold that a claim accrues as soon as physical injury manifests itself, because the likely cause of the injury might be totally unknown at that time. Plaintiffs have alleged in their complaint that "in approximately 1972, medical science discovered that teenage girls whose mothers had taken defendants' drugs, were developing [cancer] and that this condition was a direct result of their mothers having taken defendants' drugs." Complaint, ¶ 12. Thus, women with in utero exposure to DES who developed cancer prior to "approximately 1972" would have had no reason at that time to believe that their injury had a legally actionable cause. The defendants apparently concede that accrual of a cause of action bears some relation to discovery of the cause of injury, because they concede that plaintiff Renfroe's claims may have accrued as late as 1976, when plaintiff Renfroe formed the opinion that the cancer for which she had undergone surgery in 1971 had been caused by her exposure to DES.
The Court's research has not disclosed any Missouri case directly discussing this point. However, it may be inferred from Krug v. Sterling Drug, supra, that Missouri courts would not bar a cause of action for slowly developing injuries caused by a drug because the plaintiff learned too late the cause of her injuries, especially where plaintiff learned of that cause as soon as her doctor did. Moreover, in the analogous context of occupational disease cases brought under the Workmen's Compensation Act, it has been held that the statute of limitations did not begin to run until the plaintiff was aware that he had a compensable disability in the sense of a disability caused by an occupational disease which resulted from his ordinary work activities. Myers v. Rival Manufacturing Co., 442 S.W.2d 138 (Mo. App.1969).
Courts in other jurisdictions have also faced this issue, and have held that accrual of a cause of action for a latent injury is related to the time of discovery of the injury's cause. A very thorough consideration of this issue appears in Stoleson v. United States, 629 F.2d 1265 (7th Cir. 1980), a Federal Tort Claims Act case. Plaintiff in Stoleson worked in an army ammunitions plant, handling certain munitions containing nitroglycerin. After approximately one year of work, plaintiff began to experience chest pains and subsequently suffered a heart attack. However, she continued to work for three more years at the plant, until 1971. From the time of her heart attack, in 1968, plaintiff suspected that it had a connection with her working conditions; in 1969, she read a union newspaper article suggesting a connection between chest pains and nitroglycerin; and in 1969 she was informed by an occupational safety inspector that he believed her exposure to nitroglycerin caused her heart problems. However, physicians informed plaintiff in 1968 and 1969 that there was no connection, and it was not until May of 1971 that plaintiff was informed, by another doctor whom plaintiff had consulted and who did seminal research on the subject, that there was a causal connection.
Plaintiff filed her claim in August, 1972. The district court dismissed plaintiff's case at the close of her evidence on the basis that her claims accrued either in 1968, when she suffered her heart attack, or in 1969, when she read the union newspaper article and spoke to the occupational safety inspector, and hence that her claims were barred by the applicable two-year statute of limitations. The Court of Appeals reversed, holding that it was not until May of 1971, when plaintiff talked to the third doctor, who documented the relationship between nitroglycerin exposure and heart problems, that plaintiff had knowledge of the critical fact of causation. The Court pointed out that plaintiff had "acted with utmost diligence *810 in seeking to establish the cause of her heart problems," 629 F.2d at 1271, and that, despite her subjective belief that "nitroglycerin was the culprit ... had [plaintiff] sought competent legal advice [before May, 1971], she would have been informed quite correctly that she had no claim against the government." 629 F.2d at 1270. Thus, the Court of Appeals held that plaintiff's claim was timely.
Other cases bearing on this issue include United States v. Kubrick, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) (malpractice claim under the Federal Tort Claims Act accrues when plaintiff knows of his injury and its probable cause; accrual is not delayed until plaintiff learns that his injury has been negligently inflicted); Needham v. White Laboratories, Inc., 639 F.2d 394 (7th Cir. 1981) (under Illinois law, a DES plaintiff's claims did not accrue until she knew that she had a physical problem and also that someone was or might have been responsible for it) (alternative holding); Williams v. Borden, Inc., 637 F.2d 731, 734 (10th Cir. 1980) (under Oklahoma law, a claim for "meat wrappers' syndrome," a pulmonary disease, does not accrue "until the plaintiff knows, or as a reasonably prudent person should know, that he has the [injury] and that defendant has caused it") (quoting and adopting the holding of a similar Oregon case); McKenna v. Ortho Pharmaceutical Corp., 622 F.2d 657 (3d Cir.) cert. denied 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980) (under Ohio law, although injury from drug ingestion manifested itself at a certain time, running of the statute of limitations was tolled until the plaintiffs knew, or by the exercise of reasonable diligence should have known the cause of the injury); Karjala v. Johns-Manville Products Corp., 523 F.2d 155, 160 (8th Cir. 1975) (under Minnesota law, statute of limitations on personal injury claims begins to run when "some harm or impairment has manifested itself which can be shown to have been caused by an act or omission for which the defendant would be liable"); Ikenn v. Northwestern Memorial Hospital, 73 Ill.App.3d 694, 29 Ill.Dec. 883, 392 N.E.2d 440 (1979) (plaintiff's malpractice claim for blindness caused by administration of oxygen following premature birth, filed when plaintiff was 22, was barred by two-year statute because plaintiff "reasonably, and perhaps very easily" should have learned of the cause of her blindness by the time she was 20).
In accordance with all of the foregoing authorities, especially, of course, the Missouri cases, the Court believes that Missouri courts would hold that the present plaintiffs' claims did not arise or accrue until (1) the plaintiffs suffered reasonably discoverable injuries and (2) the plaintiffs knew or, in the exercise of reasonable diligence should have known, whichever first occurred, that their injuries were caused by DES exposure. Hence, their claims originated when (and where) the later of those two factors developed.
The Court turns to the relevant facts in plaintiffs' cases as shown by the depositions, interrogatory answers, affidavit, and documents submitted by defendants. (Plaintiffs have not submitted evidence in opposition to the motion). The defendants' burden, of course, is to show that there exists no genuine dispute as to any fact material to the limitations issue and that there is no room to dispute defendants' entitlement to judgment as a matter of law. Fed.R.Civ.P. 56(c).
Plaintiff Renfroe was born on February 14, 1954, in Independence, Missouri. She lived in Independence until 1960, when she moved to Canada with her family. In January, 1963, plaintiff moved to Ohio with her family, where they lived until June, 1969. At that time plaintiff and her family moved to Modesto, California, where plaintiff lived until February, 1973. Plaintiff lived in Kansas City, Missouri, from February, 1973 until September, 1973, while attending college. She returned to California in September, 1973, and remained there until July, 1974, when she moved to Washington. In September, 1975, plaintiff returned to California, where she has resided since that time.
*811 In July, 1971, while living in California, plaintiff went to a public clinic where she was treated for gonorrhea. She was told at that time that she had a small growth on her cervix that she should have checked by a gynecologist. This was the first indication plaintiff had of problems in her vaginal area. She followed this advice, and went to Dr. Ward. Her first visit was October 4, 1971; at that time Dr. Ward performed a biopsy on plaintiff. He called plaintiff's mother six days later to inform her that something was wrong, and he subsequently informed plaintiff that the biopsy disclosed cancer.
Plaintiff then had a second biopsy performed by Dr. Hill, who had plaintiff hospitalized on November 1. Plaintiff's hysterectomy was performed by Dr. Hill on November 5, 1971. Since that time, plaintiff has had periodic cytological examinations, which have all been negative. To plaintiff's knowledge, she has not had any recurrence of the cancer, and Dr. Hill has found no evidence of any recurrence.
According to plaintiff, at some time before December 10, 1971, Dr. Hill discussed with plaintiff's mother, in plaintiff's presence, his impression that plaintiff's cancer and plaintiff's mother's ingestion of stilbestrol during her pregnancy with plaintiff "seemed to be related, that there had been a few cases that he had seen or heard about and the two seemed to be related." Plaintiff Renfroe's Deposition at 113. (Plaintiff's mother had obtained copies of her pregnancy medication records and shown them to Dr. Hill.) Apparently according to plaintiff, this was the only occasion on which Dr. Hill discussed, with plaintiff or in plaintiff's presence, any causation between DES and cancer. Similarly, Dr. Hill's affidavit states that "[a]t some time during the period of time encompassing her surgery and a year thereafter, I discussed with Paul [sic] Beth Renfroe the possible association of her cervical cancer with her mother's ingestion of Stilbestrol or DES during her pregnancy with Paula Beth." Affidavit of Dr. Edward C. Hill, ¶ 9. Plaintiff Renfroe's mother has testified that by November 1, 1971, Dr. Ward had mentioned to plaintiff that the pregnancy medication was a "possible cause" of plaintiff's cancer, Deposition of Mary Renfroe at 37, and that Dr. Hill told plaintiff's mother that her ingestion of Stilbestrol necessitated the plaintiff's surgery. Id. at 80.
However, plaintiff has testified that no doctor has ever told her that DES exposure was the cause of her cancer. Plaintiff Renfroe's Deposition at 151. According to plaintiff, it was not until the fall of 1976, when plaintiff read a copy of an article by Dr. Hill on clear cell carcinoma of the cervix and vagina in young women, which relied in part on plaintiff's medical history, that plaintiff formed the belief that DES had caused her cancer. Dr. Hill's article was published in the American Journal of Obstetrics and Gynecology in June, 1973; plaintiff first saw it in the summer of 1975 when she was doing research in Seattle, Washington, but she did not read it at that time, and merely sent away for a copy of the article. Plaintiff first read a newspaper article indicating a relationship between cervical cancer and DES in "about 1973 or '4." Renfroe Deposition at 118.
Giving the plaintiff the benefit of all inferences that might be drawn from the above evidence, the Court cannot grant defendants summary judgment against plaintiff Renfroe because it is not absolutely clear that plaintiff was sufficiently apprised of a definite link between her DES exposure and her cancer while she lived in California. Dr. Hill's affidavit is somewhat vague, and plaintiff's account of the conversation almost portrays plaintiff's case as the occasion for the genesis of a theory in Dr. Hill's mind. There is a possibility left open that it was not until 1973, while plaintiff was living in Kansas City, Missouri, where she might have read a newspaper article on the subject, that plaintiff, in the exercise of reasonable diligence, had or should have had sufficient notice of the cause of her injuries to cause her claims to accrue. (Of course, it might have been while she was living in Kansas City that plaintiff, had she exercised reasonable diligence, would have discovered the cause of her injury, whether *812 or not she read a particular newspaper article on the subject.) Whether or not plaintiff should have learned of the cause of her cancer before (or after) 1973 while she lived in Missouri depends in part on the course of the development of medical science on the issue, and the Court simply does not have sufficient evidence of that aspect of the limitations issue either.
If plaintiff's claims did accrue in Missouri, then the five-year Missouri statute applies. Because plaintiff did not reach the age of 21 until February 14, 1975, her complaint would be timely under Missouri law by virtue of § 516.170, R.S.Mo.1978. The Court finds that defendants have not conclusively established that plaintiff Renfroe's claims originated, or arose, or accrued, in California instead of Missouri, and hence the motion for summary judgment will be denied as to plaintiff Renfroe.
The Court turns to the facts of plaintiff Smith's case. Plaintiff was born August 25, 1952, in St. Louis, Missouri. Plaintiff lived in St. Louis or its Missouri suburbs until September, 1963, when she and her family moved to Kansas. Plaintiff and her family moved to California in September, 1966, where plaintiff has lived since except for the period from June, 1972 to May 30, 1974, when she lived in Ohio.
Sometime in 1971, plaintiff's mother read an article in Time magazine about the high incidence, possibly linked to DES, of cancer in young women, and made an appointment for plaintiff to see Dr. Walker. Dr. Walker did a pap smear on plaintiff, with negative results. After this examination, plaintiff read the Time article and was informed by her mother that she had taken DES.
After moving to Ohio, plaintiff had a pelvic exam and pap smear at a public clinic in September, 1972. The results were negative. In August, 1973, plaintiff visited Dr. Baurichter to have a pap smear done because she was aware, from her 1971 conversation with her mother, that she might develop cancer. This test was negative. On May 20, 1974, plaintiff first went to Dr. Avery, in Cincinnati, because she believed she had a vaginal infection. Dr. Avery performed a pelvic examination and took a biopsy. On May 29, 1974, plaintiff was told by Dr. Avery that she had cancer.
Plaintiff flew home to California the next day; she was admitted to Stanford University Hospital, after further testing by Dr. Lamb, on June 10, 1974. Plaintiff's operation was performed on June 11, 1974. Since that time she has not had any major physical complaints, other than a residual urinary problem. All of her check-ups since the operation have been negative. Two of plaintiff's treating doctors in California informed plaintiff, while she was hospitalized, that they believed her cancer was caused by DES. Plaintiff Smith's Deposition at 94. While plaintiff was hospitalized for surgery, she was examined by other doctors who were researching the link between DES and cancer. Dr. Lamb informed plaintiff that he would be able to get further funding for more research on the subject of that link, on the strength of his study of plaintiff and other patients at the hospital.
Approximately one year after plaintiff's surgery, plaintiff answered a newspaper ad for DES mothers or daughters. She was told by a woman who answered the telephone number listed in the ad that she should get legal help, and plaintiff was given Melvin Belli's number. Plaintiff called Mr. Belli (who is co-counsel of record for plaintiffs in this action). On April 19, 1976, plaintiff's doctor noted that plaintiff was "involved in a lawsuit" against the drug companies.
The Court believes that on the basis of the foregoing, it is impossible to determine whether plaintiff Smith's claims originated in Ohio or in California. Although plaintiff may have believed that her cancer, when discovered in Ohio, was caused by DES, it is not clear that she was aware of sufficient medical authority to verify her opinion until she was told by her treating doctors in California that they believed that DES exposure caused her cancer. As discussed above, the critical question is not when the plaintiff formed a subjective belief that DES caused her cancer, but when she had or, in the exercise of reasonable diligence *813 should have had notice of sufficient medical authority to go to the trier of fact. Stoleson v. United States, supra. As it is not clear whether this occurred in Ohio or in California, the Court must consider whether plaintiff Smith's claims are barred under both statutes.
Defendants contend that the governing Ohio statute of limitations is Ohio Rev.Code Ann. § 2305.10, which provides that "[a]n action for bodily injury or injuring personal property shall be brought within two years after the cause thereof arose." Plaintiffs do not argue otherwise. In Andrianos v. Community Traction Co., 155 Ohio St. 47, 97 N.E.2d 549 (Ohio, 1951), in which the plaintiff was injured while riding as a passenger on one of the defendant's buses, the statute was held to govern "all actions the real purpose of which is to recover damages for injury to the person and losses incident thereto and it makes no difference whether such action is for a breach of contract or strictly in tort. The limitation is imposed on the cause of action and the form in which the action is brought is immaterial." 97 N.E.2d at 550. Thus, § 2305.10 applies to all tort actions in which recovery for personal injuries is sought.[1] This Court finds that § 2305.10 applies to all claims in this action.
The statute has been held to begin to run (after injury has manifested itself) when the plaintiff knows, or by the exercise of reasonable diligence should know, the cause of injury. McKenna v. Ortho Pharmaceutical Corp., supra. In an earlier interpretation of the statute, the Sixth Circuit approved the Fifth Circuit's approach that it would begin to run when some damage, although not necessarily the ultimate damage, occurred. Brush Beryllium Co. v. Meckley, 284 F.2d 797 (6th Cir. 1960).
Under either interpretation, the Court finds that the statute began to run on plaintiff Smith's claims at the latest on June 22, 1974, when she was released from the hospital after her surgery, because by that time two of plaintiff's physicians had told her that it was their belief that plaintiff's cancer was caused by DES. The Court believes that it is beyond dispute that by that point, plaintiff no longer had a mere subjective belief that DES caused her cancer, but had sufficient notice of medical knowledge that would support her belief. Accordingly, as this action was not filed until August 17, 1978, it is barred as to plaintiff Smith by the Ohio statute unless some other provision of Ohio law operated to toll its running. It is clear that Missouri courts would apply the whole complex of Ohio statutes and decisions relating to the limitations period, not merely the statute prescribing the period. Devine v. Rook, 314 S.W.2d 932 (Mo.App.1958); Young v. Hicks, 250 F.2d 80 (8th Cir. 1957).
Plaintiff Smith argues that § 2305.15 of the Ohio Revised Code operated to toll the running of the statute of limitations. Section 2305.15 reads in part as follows: "When a cause of action accrues against a person, if he is out of state, ... the period of limitation for the commencement of the action ... does not begin to run until he comes into the state...." This "saving clause" has been interpreted as follows:
Under Ohio law, the "saving clause's" tolling of the statute of limitations is tied to a defendant's amenability to personal service. Seeley v. Expert, Inc., 26 Ohio St.2d 61, 65-66, 269 N.E.2d 121, 128 (1971). If a defendant is not amenable to personal service within the state of Ohio, that defendant is deemed to be "out of state" within the meaning of Section 2305.15 and the statute of limitations is prevented from running in his favor. This rule applies even when the defendant is a nonresident of Ohio, and despite the fact that substituted service is available under the Ohio Rules of Civil Procedure. See Seeley v. Expert, Inc., [supra].

*814 In effect, under Ohio law a corporation that is not physically present (or that does not have a statutory agent) in Ohioand thereby is not amenable to personal servicenever receives the protection of the two year statute of limitations contained in section 2305.10. Ohio Brass Co. v. Allied Products Corp., 339 F.Supp. 417, 424 (N.D.Ohio 1972); Seeley v. Expert, Inc., [supra]. While the Ohio Supreme Court's construction of section 2305.15 has been criticized, in a diversity action in which Ohio law controls a federal district court must nonetheless follow the Ohio Supreme Court's interpretations of Ohio statutes.
Mead Corp. v. Allendale Mutual Insurance Co., 465 F.Supp. 355, 361-62 (N.D.Ohio 1979) (footnote omitted); accord, Scheer v. Air-Shields, 61 Ohio App.2d 205, 401 N.E.2d 478 (1979). Therefore, as to those defendants who were not subject to personal service in Ohio in accordance with Ohio statute or rules, the "saving clause" tolled the running of the statute of limitations.
Ohio Civil Rule 4.2 (1971 and Supp.1980) effective July 1, 1970, provides as follows:
Service of process ... shall be made as follows:
(6) Upon a corporation either domestic or foreign: by serving the agent authorized by appointment or by law to receive service of process; or by serving the corporation by certified mail at any of its usual places of business; or by serving an officer or a managing or general agent of the corporation.
It appears from the affidavits that have been filed that the following defendants have had registered agents in the State of Ohio for at least a two-year period between July, 1976, and August 17, 1978: Eli Lilly and Company, Rexall Drug Company, The Upjohn Company, Abbott Laboratories, E. R. Squibb and Sons, Inc., Merck & Co., Inc., and McNeilab, Inc. Thus, even if plaintiff's claims accrued as late as April, 1976, as defendants were prepared to concede, plaintiff's claims, if they arose in Ohio, are barred as to these defendants.
An affidavit submitted on behalf of defendant Carnrick Laboratories, Inc. states that at all pertinent times, said defendant was doing business and engaged in the sale of products in Ohio and has had a salesperson in Ohio since 1970. Defendant Kremers-Urban Company's affidavit states that it had salespersons in Ohio throughout the 1970's. Defendant Rowell Laboratories, Inc.'s affidavit states that it was present and doing business in Ohio since plaintiff Smith was first diagnosed as having cancer and that it distributed diethylstilbestrol in Ohio.
The Court finds that the affidavits submitted on behalf of defendants Carnrick Laboratories, Inc., Kremers-Urban Company, and Rowell Laboratories, Inc. do not conclusively establish that those defendants were amenable to service in Ohio, for a two-year period between June 22, 1974, and August 18, 1978, in accordance with Ohio Civil Rule 4.2. See Ohio Brass Company v. Allied Products Corporation, 339 F.Supp. 417 (N.D.Ohio 1972). Accordingly, the Court cannot grant summary judgment as to said defendants, or as to defendants Reed and Carnrick Pharmaceuticals, Blue Line Chemical Company, or Comark, Inc., who did not file any affidavits pertaining to their amenability to service in Ohio. Of course, any of these defendants may be able to establish at trial that they were amenable to service in Ohio in the relevant period, and thus that plaintiff Smith's claims, if they accrued in Ohio, are time-barred as to them.
As to defendants Eli Lilly, Rexall, Upjohn, Abbott Laboratories, Squibb, Merck, and McNeilab, the question remains whether they are also entitled to summary judgment if plaintiff Smith's causes of action accrued in California. Defendants contend that the applicable statute is Cal.Code of Civ.Pro. § 340(3), which, since before 1974, has provided a one-year period for bringing "[a]n action for ... injury to ... one caused by the wrongful act or neglect of another...." Plaintiffs, however, contend that Cal.Civil Code § 29 is applicable. Section 29 provides:

*815 A child conceived, but not yet born, is to be deemed an existing person, so far as may be necessary for its interests in the event of its subsequent birth; but any action by or on behalf of a minor for personal injuries sustained prior to or in the course of his birth must be brought within six years from the date of the birth of the minor, and the time such minor is under any disability mentioned in Section 352 of the Code of Civil Procedure shall not be excluded in computing the time limited for the commencement of the action."
This section has been interpreted, in the context of malpractice actions, to be subject to the "discovery rule" of accrual, discussed above: "the statute of limitations commences to run when the plaintiff discovers the injury and its negligent cause or through the exercise of reasonable diligence should have discovered it." Segura v. Brundage, 91 Cal.App.3d 19, 27, 153 Cal. Rptr. 777, 781-82 (1979) (quoting Whitfield v. Roth, 10 Cal.3d 874, 112 Cal.Rptr. 540, 519 P.2d 588 (1974)).
However, in the DES case of Sindell v. Abbott Laboratories, 85 Cal.App.3d 1, 149 Cal.Rptr. 138 (1978), superseded, 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 cert. denied 449 U.S. 912, 101 S.Ct. 285, 286, 66 L.Ed.2d 140 (1980), the California Court of Appeals held that the one-year limitations period of § 340(3) applied, and that § 29 was not applicable.[2] The Court said that § 29 was not meant to apply to injuries which do not manifest themselves until long after infancy. In the decision superseding the lower Sindell decision, the California Supreme Court made no mention of the limitations issue. Accordingly, this Court believes that the decision of the Court of Appeals is entitled to determinative weight on the issue of the applicable statute of limitations. Moreover, it is surely a reasonable interpretation, given the fact that the disability of infancy is among those excluded from computation of the limitations period under § 29. Accordingly, this Court finds that § 340(3) governs.
It has been held in California, as in other jurisdictions, that a claim for slowly developing injuries accrues when the plaintiff discovers or, by the exercise of reasonable diligence, should have discovered the cause of injury. Sindell, supra, 149 Cal. Rptr. 138, at 151; G. D. Searle & Co. v. Superior Court, 49 Cal.App.3d 22, 25, 122 Cal.Rptr. 218 (1975). See Comment, Accrual of Statutes of Limitations: California's Discovery Exceptions Swallow the Rule, 68 Cal.L.Rev. 106 (1980). By this standard, plaintiff Smith's claims accrued, at the latest, by June 22, 1974, when she was released from the hospital. Hence, plaintiff Smith's complaint, filed August 17, 1978, is untimely as to these defendants unless some tolling provision applies.
Plaintiff argues that Cal.Civ.Proc.Code § 351, which provides that the statute is tolled as to any "person, [who] is out of the State" applies. However, this statute has been construed, as to corporate defendants, to mean that it is nonamenability to service of process, including substituted service, that causes the tolling provision to apply. Loope v. Greyhound Lines, Inc., 114 Cal. App.2d 611, 250 P.2d 651 (1952); cf. Dew v. Appleberry, 23 Cal.3d 630, 153 Cal.Rptr. 219, 591 P.2d 509 (Cal.1979) (en banc) (§ 351 must be read literally as to individual defendants).
At any rate, each of these defendants has stated in its affidavit that it had a registered agent in California, at least since 1972. Therefore, there appears to be no question but that plaintiff Smith's claims, whether viewed as arising in Ohio or California, are time-barred as to these defendants, and judgment will be entered in these defendants' favor on plaintiff Smith's claims.
NOTES
[1] In Mahalsky v. Salem Tool Co., 461 F.2d 581 (6th Cir. 1972), the Andrianos court's interpretation of § 2305.10 was applied to a products liability case in which recovery for injury to personal property was sought on theories of express and implied warranty, negligent representations, and negligent design.
[2] The Sindell complaint involved causes of action based on negligence, industry-wide liability, strict liability, violation of express and implied warranties, false representations, misbranding in violation of federal law, conspiracy, and "lack of consent."