Helen J. STOLESON, Plaintiff–Appellant,

v.

UNITED STATES of America, Defendant–Appellee.

No. 79–2306.

United States Court of Appeals, Seventh Circuit.

Argued April 7, 1980.
Decided Sept. 12, 1980.

Ronald L. Wallenfang, Quarles & Brady, John A. Rothstein, Milwaukee, Wis., for plaintiff–appellant.

Howard S. Scher, Dept. of Justice, Washington, D. C., for defendant–appellee.

Before FAIRCHILD, Chief Judge, and PELL and WOOD, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

At issue is whether Helen Stoleson's suit under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.*, is barred by that statute's two–year limitation period. *Id.* § 2401(b). Since Mrs. Stoleson was injured more than two years before filing suit, resolution of the determinative issue requires that we consider whether the so–called "discovery rule" is applicable outside the medical malpractice arena, and if so, whether the facts of this case justify its application.

In early 1967 Mrs. Stoleson began working as a roll house operator in the rocket area of the Badger Army Ammunition Plant (BAAP).[1] As part of her job, Mrs. Stoleson handled and processed munitions and rocket propellants containing nitroglycerin. Near the end of 1967 Mrs. Stoleson began, on weekends, to experience anginal–type chest pains. On a weekend in late January 1968 she suffered a severe angina attack and, on the morning of February 5, 1968, was hospitalized after complaining of severe chest pains. She remained hospitalized for several weeks with a condition diagnosed at the time as coronary insufficiency and subsequently as a myocardial infarction caused by a vascular spasm triggered by temporary withdrawal from nitroglycerin. Following Mrs. Stoleson's return to work on May 1, 1968, she suffered weekend angina attacks at progressively frequent intervals. By the time BAAP terminated her employment in May 1971, the attacks were occurring four to five times each weekend.

---

1. During the relevant period, the Olin Corporation operated BAAP pursuant to a cost–plus fixed fee contract. The district court found that the Government had pervasive influence and authority over Olin and that the Government therefore shared with Olin whatever duties Olin owed to its employees. By stipulation, that finding is not a subject of this appeal.

From the time of her heart attack in 1968, Mrs. Stoleson suspected a connection between her heart problems and her working conditions. Although the treating physician informed her that exposure to nitroglycerin was not the cause, Mrs. Stoleson, upon returning to work, requested that she be reassigned to a work area free of nitroglycerin. BAAP denied the transfer, apparently because its in–house physician was of the opinion, which he expressed to Mrs. Stoleson, that nitroglycerin exposure would be *beneficial* to her.

In the spring of 1969, Mrs. Stoleson read in a union newspaper an article suggesting that sudden withdrawal from nitroglycerin exposure may cause anginal chest pains. In the fall of that year, George Coolidge, an occupational safety inspector employed by the Wisconsin Department of Industry, Labor and Human Relations, told Mrs. Stoleson that he believed her heart problems were caused by exposure to nitroglycerin but cautioned that he was unaware of any medically recognized causal relation. Shortly after her discussion with Coolidge, Mrs. Stoleson consulted another of her personal physicians who confirmed the previous medical appraisals as well as the continuing assurances from BAAP that Mrs. Stoleson's suspicions were groundless.

In April 1971, Dr. R. L. Lange, chief of cardiology at the Medical College of Wisconsin, examined Mrs. Stoleson and concluded that her cardiovascular problems *were* related to nitroglycerin exposure. Despite Dr. Lange's opinion, the BAAP physician continued to maintain that nitroglycerin was not the cause of Mrs. Stoleson's problems. He therefore recommended that rather than transfer Mrs. Stoleson, she be discharged as unable to work.

Based upon Mrs. Stoleson's case and eight other BAAP case histories, Dr. Lange published a seminal article, documenting for the first time the relationship between angina and chronic exposure to nitroglycerin. This article marked the first medical identification of the causal relation; neither clinical cardiology texts nor medical journals had previously discussed or described the phenomenon of angina among workers regularly exposed to nitroglycerin.

Mrs. Stoleson filed an administrative claim on August 16, 1972, which tolled the statute of limitations and, after an unsuccessful journey through the administrative process, brought suit under the FTCA, alleging that as a result of the Government's negligence in superintending the operation and maintenance of BAAP she ingested nitroglycerin, which caused her heart problems. Upon the close of her case, the district court orally granted the Government's motion for involuntary dismissal pursuant to Fed.R.Civ.P. 41(b) and later issued written findings of fact and conclusions of law in support of the involuntary dismissal. Although the district court found the Government was negligent in failing to protect Mrs. Stoleson from exposure to high levels of nitroglycerin, it concluded dismissal was proper because the two–year statute of limitations barred her claim for injuries suffered before August 15, 1970, and her failure to prove proximate causation barred her claim for injuries suffered after that date. With respect to the statute of limitations, the court concluded that absent an application of the discovery rule, Mrs. Stoleson's claim accrued on the date of demonstrable injury, February 5, 1968, when she was hospitalized for a myocardial infarction. Alternatively, the court concluded that if the discovery rule was applicable, her claim accrued in November 1969, when she read the union newspaper article and spoke to George Coolidge. Because she filed her administrative claim on August 16, 1972, more than two years after either of these dates, the court held that any claim for injuries suffered on or before August 15, 1970 was time barred. Furthermore, the district court found that Mrs. Stoleson did not prove by a preponderance of the evidence that the Government's negligence proximately caused any new injuries (as distinguished from the continuing effects of the myocardial infarction) she might have suffered after August 15, 1970.

By stipulation, the parties limited this appeal to the statute of limitations and

causation issues. In light of our disposition of the statute of limitations issue, we need not reach the causation issue.

## I.

Although FTCA liability is determined "in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b), federal law determines when a claim accrues. *Steele v. United States*, 599 F.2d 823 (7th Cir. 1979). The determinative federal law is 28 U.S.C. § 2401(b), which bars any tort claim against the United States not presented in writing within two years of accrual.[2] Ordinarily, a tort claim accrues at the time the claimant is demonstrably injured. *See Zeidler v. United States*, 601 F.2d 527 (10th Cir. 1979). In the usual case, the fact of injury provides adequate notice of the cause of the injury and of the possibility that one's legal rights have been invaded. Restatement (Second) of Torts § 899, comment c (1977). This general rule, however, is often inapplicable to medical malpractice claims. *See, e. g., United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979); *Portis v. United States*, 483 F.2d 670 (4th Cir. 1973). The reason for the exception is essentially the same as for the general rule, i. e., a patient often has little or no reason to believe his legal rights have been invaded simply because some misfortune followed medical treatment. Sometimes a patient may remain unaware for many years that he has suffered injury or he may recognize his injury but not its cause. Indeed, the facts necessary to discover the causal relation between treatment and injury may be within the exclusive control of the physician or at least very difficult to obtain. In medical malpractice cases, therefore, the statute of limitations does not begin to run until after the patient discovers or in the exercise of reasonable diligence should discover his injury and its cause. *See Kubrick*, 444 U.S. at 120 n.7, 100 S.Ct. at 358 n.7.[3] In seeking to have us apply the more liberal rule to this occupational safety case, Mrs. Stoleson urges that the discovery rule is not limited to malpractice cases. We expressly raised and reserved that issue in *Steele v. United States*, 599 F.2d at 827 n.7. Today we hold the rule is not so limited.

In *Steele*, the factors that justify the application of the discovery rule to medical malpractice claims were simply not present.[4] The plaintiff's injury, an electrical shock, was immediately apparent, as was its cause, failure of a Federal Aviation Administration employee to turn off the current while the plaintiff installed lights on an inactive runway at O'Hare International Airport. That we did not apply the discovery rule to this "ordinary tort case," is not inconsistent with application of the rule in contexts other than medical malpractice where the equitable considerations

---

2. 28 U.S.C. § 2401(b) provides:

    A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

3. Several courts of appeals, including this one, have recently expanded the discovery rule to prevent accrual of a claim until a patient has had a reasonable opportunity to discover each of the elements of a cause of action–duty, breach, causation, and damages. *De Witt v. United States*, 593 F.2d 276 (7th Cir. 1979), *rev'd on rehearing*, 618 F.2d 114 (7th Cir. 1980); *Exnicious v. United States*, 563 F.2d 418 (10th Cir. 1977); *Bridgford v. United States*, 550 F.2d 978 (4th Cir. 1977); *Jordan v. United States*,

503 F.2d 620 (6th Cir. 1974). This expansion was cut short and back by the Supreme Court in *Kubrick*. A claim accrues when a patient acquires possession of the critical facts of injury and cause. 444 U.S. at 122-24, 100 S.Ct. at 359-60.

4. Citing the circuit court opinion in *Kubrick v. United States*, 581 F.2d 1092 (3d Cir. 1978), *rev'd*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1980), we also noted that even if the injury and its cause are obvious, a patient unschooled in medical science may find it difficult to determine whether the treatment he received was a deviation from professional standards of due care. *See also De Witt v. United States*, 593 F.2d 276 (7th Cir. 1979), *rev'd on rehearing*, 618 F.2d 114 (7th Cir. 1980). That rationale, of course, has little force after *Kubrick*. *See* note 3 *supra*; pp. 9–10 *infra*.

are compelling. That the United States Supreme Court did just that in *Urie v. Thompson*, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949), speaks with considerable force about the scope of the discovery rule.

In *Urie*, a railroad fireman, sued under the Federal Employers' Liability Act, 45 U.S.C. § 51 *et seq.*, claiming he had contracted silicosis as a result of breathing silica dust for nearly thirty years. The applicable statute of limitations provided that claims for compensation had to be filed within three years of accrual. The defendant argued that since the plaintiff had been exposed to silica for so long, he must have unknowingly contracted silicosis long before (at least three years, that is) bringing suit. Thus, the defendant argued, the claim was barred.

The Supreme Court rejected this analysis, opting instead for what has long been recognized, *see Quinton v. United States*, 304 F.2d 234, 240–41 (5th Cir. 1962), as the precursor of the discovery rule:

If Urie were held barred from prosecuting this action because he must be said, as a matter of law, to have contracted silicosis [more than three years prior to filing suit], it would be clear that the federal legislation afforded Urie only a delusive remedy. It would mean that at some past moment in time, unknown and inherently unknowable even in retrospect, Urie was charged with knowledge of the slow and tragic disintegration of his lungs; under this view Urie's failure to diagnose within the applicable statute of limitations a disease whose symptoms had not yet obtruded on his consciousness would constitute waiver of his right to compensation at the ultimate day of discovery and disability. * * * * We do not think the humane legislative plan intended such consequences to attach to blameless ignorance.

*Id.* at 169–70, 69 S.Ct. at 1024–25. *Accord, Kuhne v. United States*, 250 F.Supp. 523, 526 (E.D.Tenn.1965) (radiation exposure). Thus, the Court held the plaintiff's claim did not accrue until after he discovered the existence, and consequently the cause of his ailment.

*Urie* teaches that it is the nature of the problems faced by a plaintiff in discovering his injury and its cause, and not the occupation of the defendant, that governs the applicability of the discovery rule. That a claim may or may not arise from a physician's malpractice is purely incidental. We see no reason to ameliorate the harsh consequences of the statute of limitations in one category of cases to the exclusion of all others. ○ Rather, any plaintiff who is blamelessly ignorant of the existence or cause of his injury shall be accorded the benefits of the discovery rule. Many malpractice plaintiffs face serious problems in discovering these critical facts. But as *Urie* demonstrates, the rule was not created in a medical malpractice context and is not limited to such cases.

## II.

In *De Witt v. United States*, 593 F.2d 276, 279 (7th Cir. 1979), *rev'd on rehearing*, 618 F.2d 114 (7th Cir. 1980), a divided panel of this circuit joined a number of other circuits, *see* note 3 *supra*, in holding that a medical malpractice plaintiff's claim does not accrue until after he has a reasonable opportunity to discover all of the essential elements of a possible cause of action–duty, breach, causation, and damages. *Id.* at 279. This extension of the discovery rule, however, was short–lived. In *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), the Supreme Court reversed a Third Circuit holding similar to our holding in *De Witt*. In doing so, the Court held that accrual of a medical malpractice claim need not await discovery of all elements of a cause of action; a claim accrues when a plaintiff discovers or, in the exercise of reasonable diligence, should discover the "critical facts" of injury and cause. The statute then begins its progress with or without the plaintiff's knowledge that the defendant's conduct constitutes negligence.

Underlying *Kubrick* is the recognition that a plaintiff armed with knowledge of his injury and its cause is no longer at the mercy of a defendant's specialized knowl-

edge. A plaintiff in that position need only inquire of other professionals, including lawyers, whether he has been legally wronged. Upon securing competent advice, the plaintiff can make an intelligent decision whether to bring suit.

We turn now to Mrs. Stoleson's situation to determine when she learned the critical facts. As early as February 5, 1968, when she was hospitalized, Mrs. Stoleson knew she had been injured. At that time, she suspected the cause of her injury was her occupational exposure to nitroglycerin. In an attempt to confirm her suspicion, Mrs. Stoleson questioned her personal physician about the likelihood that nitroglycerin exposure was the cause of her heart problems. He informed her that there existed no medical evidence of a causal connection. Mrs. Stoleson nevertheless persisted in her suspicion. When she returned to work in May 1968, she requested a transfer to a nitroglycerin–free work area. The BAAP in–house physician, however, refused her request, informing her that to the contrary nitroglycerin exposure would be beneficial.

■ The Government contends Mrs. Stoleson's suspicion that nitroglycerin was the culprit is sufficient knowledge of causation to trigger the statute of limitations. We disagree. A layman's subjective belief, regardless of its sincerity or ultimate vindication, is patently inadequate to go to the trier of fact. Therefore, had Mrs. Stoleson sought competent legal advice, she would have been informed quite correctly that she had no claim against the Government. The Supreme Court was careful to note that had Kubrick timely sought medical and legal advice he would have discovered that his physician had been negligent. 444 U.S. at 122–23, 100 S.Ct. at 359–60. In short, because medical science recognized that the treatment Kubrick received was inappropriate and caused the kind of injury he suffered, Kubrick was not blameless for his ignorance and delay. All he had to do was

ask. Although he had a cause of action, he lacked the presence of mind to seek the advice of those who could competently advise him that his claim was valid. Mrs. Stoleson, on the other hand, did have the presence of mind to seek professional advice from her physicians and BAAP's own physician.[5] But since medical science did not then recognize the causal connection, she was powerless to pursue the matter through legal channels. To fix the time of accrual at this time would provide Mrs. Stoleson with nothing more than a delusive remedy.

■ For the same reasons, Mrs. Stoleson's claim did not accrue in the spring of 1969 when she read the union newspaper article suggesting a possible link between cardiovascular problems and exposure to nitroglycerin. Nor did it accrue in the fall of that year when the state occupational safety specialist, who was neither a physician nor for that matter even a college graduate, expressed an opinion confirming Mrs. Stoleson's suspicion. Mrs. Stoleson still remained a prisoner within the walls of medical science. Rather than initiate a futile suit, she diligently consulted yet another physician in a further attempt to secure medical confirmation that nitroglycerin exposure was the cause of her problems. That physician instead confirmed the opinions of the physicians she had previously consulted. Even armed with the occupational safety expert's opinion and the union newspaper article, the suggestion that Mrs. Stoleson had a claim that she could judicially enforce is implausible.

It was not until April 30, 1971 that Dr. Lange of the Medical College of Wisconsin documented for the first time the relationship between occupational exposure to nitroglycerin and cardiovascular problems. The following month he informed Mrs. Stoleson of his findings and their relevance to her. Only at this point did Mrs. Stoleson's suspicion ripen into knowledge of the

---

5. The Government, of course, should not be burdened by stale claims that result from incompetent or mistaken medical advice. 444 U.S. at 124, 100 S.Ct. at 361. There is no suggestion in the record that any of the physicians Mrs. Stoleson consulted offered either incompetent or mistaken advice. To the contrary, each opinion was fully consistent with medical theories recognized as authoritative at the time the opinions were rendered.

missing critical fact—causation. Despite or perhaps because of her diligence, this was the first point in time at which she could have pursued a claim against the Government and, therefore, under *Kubrick*, the moment at which the statute of limitations commenced to run. *See Waits v. United States*, 611 F.2d 550 (5th Cir. 1980). Since she filed within two years of that date, we hold her claim was timely.

We recognize that at first blush this holding appears to burden defendants indefinitely with the risk that they may be called upon to answer for some long—forgotten conduct that medical science recognizes only years later to be harmful. Concededly, if medical science had not recognized the causal relation between chronic nitroglycerin exposure and cardiovascular problems until the year 2000, the statute of limitations would not commence to run until that late date. Although this appears to undermine the policy inherent in section 2401(b) of protecting the Government against stale claims, postponement will only burden defendants in cases like this where they have breached a preexisting duty.

The Surgeon General of the United States in 1951 established certain safety precautions to be undertaken in facilities where employees are exposed to nitroglycerin.[6] The district court found that the failure of BAAP to implement these safety precautions under circumstances in which a reasonably prudent person would have foreseen that such an omission would expose others to an unreasonable risk of injury, was negligent.[7] Mrs. Stoleson therefore had a sound legal basis for her tort claim: duty and breach. All that she lacked was knowledge of a causal relation to tie these two elements of negligence to her injury. In the more usual case, subsequent discovery of a causal connection between an injury and practices or substances previously considered safe will mark the initial attachment of a duty to take preventive measures. In those circumstances, there exists no standard of care until discovery of the causal relation; thus there is no breach and no actionable wrong.

The Government was aware that certain other health hazards resulted from exposure to nitroglycerin yet did not conform to its own safety standards promulgated to protect against those health hazards. Mrs. Stoleson, in contrast, acted with utmost diligence in seeking to establish the cause of her heart problems. Furthermore, the competent medical opinions she so diligently sought, including that of the BAAP physician, dissuaded her from presenting a futile FTCA claim. She is not the kind of plaintiff nor is this the kind of case that a statute of repose like section 2401(b) or the *Kubrick* decision seek to protect against.

Accordingly, the involuntary dismissal entered by the district court is reversed, and the case is remanded for trial on the merits.

Reversed and remanded.

---

6. In addition, the Ordnance Corps of the Department of the Army established the following pertinent regulation:

> Workers . . . having significant exposure to nitroglycerin should not be permitted to leave the establishment after work until they have taken a thorough shower or bath and made a complete change to uncontaminated clothing. They should be provided with powder uniforms . . . underwear, socks and head covering. These should be laundered daily unless the health unit recommends less frequent laundering.
>
>     \*    \*    \*    \*    \*    \*
>
> Each worker having a toxic exposure should be provided two lockers, one for street clothes and one for work clothes. . . .

Change houses for workers in toxic exposure normally should be designed in a manner to afford effective control of compulsory bathing. . . . For workers having substantial exposure to . . . nitroglycerin, two lockers should be provided for each exposed worker, one for the street clothes and one for the work clothes.

ORDM 7-225. These precautions were deemed necessary because research had established that exposure to nitroglycerin caused infirmities other than those suffered by Mrs. Stoleson, particularly severe headaches, heart and body pulsations, and diarrhea.

7. By stipulation, the propriety of that finding is not before us for consideration.