Justin K. **FRASURE** Plaintiff,

v.

**UNITED STATES of America, Defendant.**

No. CV–N–00–0484–LRH(VPC).

United States District Court, D. Nevada.

March 28, 2003.

Amy L. Parks, White & Meany, Geoffrey White, White & Meany, Reno, for Frasure, Justin K., Plaintiff.

Timothy B. Walthall, U.S. DOJ—Civil Division, Washington, DC, for United States Of America, Defendant.

## ORDER

HICKS, District Judge.

Before the Court are Defendant's Motion to Dismiss or in the alternative for Summary Judgment (Docket # 26), Motion for Summary Judgment (Docket # 27), and Motion to Reconsider (Docket # 28) the Court's Order of June 7, 2002. The Court addresses each of the Defendant's motions in turn.

## I. BACKGROUND

Plaintiff Justin K. Frasure was born on August 31, 1980. (Complaint, ¶ 8). In 1986, Plaintiff developed a kidney problem arising from a nephritic syndrome of the focal and segmental glomerulosclerosis. (*Id.*, ¶ 10). Because of this disease, Plaintiff underwent a kidney transplant in July 1992. (*Id.*) Plaintiff's physical condition subsequently improved to the point that he was able to play outside, which he often did on abandoned industrial land located near his home in Sparks, Nevada. (*Id.*, ¶ 12). On occasion between 1992 and 1994, Plaintiff and his friends would dig in the dirt on this site and uncover yellowish crystals, at least one of which he kept at home. (*Id.*, ¶ 13).

Plaintiff later learned that the land on which he played is the former Monite Explosives Factory Site or "Monite Site", which became the focus of a Superfund cleanup between 1995 and 1997, because of high levels of trinitroluene ("TNT"), dinitrotoluene ("DNT"), and other hazardous substances in the soil. (*Id.*, 14). The Monite Site was used for the manufacture, packaging and dismantling of explosives

over many decades. (*Id.*, ¶ 29). Defendant has always owned the Monite Site, but its ownership status was clarified in the 1970's. (*Id.*, ¶¶ 33–35).

In February 1994, Plaintiff's transplanted kidney failed. (*Id.*, ¶ 15). Near death, Plaintiff was admitted to the UCSF Medical Center at least four times because of the failure of his bone marrow, aplastic anemia, pancytopenia, gastro-intestinal bleeding, severe mucocutaneous lesions in his mouth, the inability to swallow, fevers, rashes, and the loss of his hair. (*Id.*, ¶ 16). Plaintiff asserts that, because of these conditions, he is forever unable to receive a transplanted kidney to replace the failed transplanted kidney and must regularly undergo dialysis. (*Id.*, ¶¶ 16 & 19). Today, Plaintiff's physical health is severely compromised. He suffers constant pain and is prone to illness. He is unable to work or enjoy the life of a person who has undergone a successful kidney transplant. (*Id.*, ¶ 20). At least one specialist has linked Plaintiff's life threatening illness to his exposure to hazardous levels of TNT and DNT to the Monite Site. (*Id.*, ¶ 21).

As a result of his injuries, Plaintiff brought the instant action under the Federal Tort Claims Act alleging negligence. Plaintiff asserts that Defendant was on notice, at least by 1992, if not earlier, of hazardous materials being uncovered and subsequently disposed of by Plaintiff, including a drum of explosives in crystalline form. (*Id.*, ¶ 43).

Plaintiff alleges that Defendant acted negligently in adequately fencing a portion of the property and for failing to post adequate signs or notices to alert the public of the presence of hazardous substances. (*Id.*, ¶¶ 44, 47–49). Plaintiff further alleges that Defendant negligently delayed testing the soil, expanding the fenced area and later informing the public of the risks associated with the Monite Site. (*Id.*, ¶¶ 56–66).

## II. MOTION TO RECONSIDER

### A. PROCEDURAL BACKGROUND

Defendant United States of America filed a Motion to Dismiss pursuant to Fed. R.Civ.P. 12(b)(1) on June 15, 2001. (Docket # 18). (Plaintiff timely filed an Opposition on July 9, 2001), (# 20) and (Defendants filed a Reply on July 23, 2001).(# 21). This case was reassigned to the undersigned Judge on January 17, 2002.(# 22). The Court denied the Defendant's Motion to Dismiss in its Order of July 7, 2002 (Docket # 24). Defendant subsequently filed the present Motion to Reconsider (Docket # 28) predicated on the Court using an erroneous legal standard.

For the following reasons, the Defendant's Motion to Reconsider will be denied.

### B. STANDARD OF REVIEW

■ A motion to reconsider must provide a court with valid grounds for reconsideration by: (1) showing some valid reason why the court should reconsider its prior decision, and (2) setting forth facts or law of a strongly convincing nature to persuade the court to reverse its prior decision. *All Hawaii Tours Corp. v. Polynesian Cultural Ctr.*, 116 F.R.D. 645, 648–49 (D.Haw.1987), *rev'd on other grounds*, 855 F.2d 860 (1988).

■ "Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *School Dist. No. IJ, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).

### C. DISCUSSION

Defendant has moved the Court to reconsider Defendant's Motion to Dismiss on

the grounds that the Court applied the incorrect legal standard. Defendant points out that the Court cited a number of cases in its standard of review, which address motions to dismiss under Rule 12(b)(6). The Defendant sought dismissal under Rule 12(b)(1), a motion to dismiss for lack of subject matter jurisdiction.

Even under the 12(b)(1) standard, however, it is clear that the Defendant's Motion would not succeed. Therefore, the Defendant's Motion to Reconsider will be denied. However, for clarification purposes, the Court will discuss the Rule 12(b)(1) standard and its application to this case.

### 1. APPLICABLE LAW FOR 12(b)(1) MOTION TO DISMISS

A 12(b)(1) motion can be made in one of two ways. The motion can challenge the sufficiency of the pleadings to support subject matter jurisdiction (a facial challenge), or it can challenge the actual existence of jurisdiction (a factual attack) by way of a "speaking motion." In the latter case, the judge may consider outside evidence and resolve factual disputes. *Berardinelli v. Castle & Cooke, Inc.*, 587 F.2d 37, 39 (9th Cir.1978); *See also, Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir.1983). (holding that unlike a motion to dismiss for failure to state a claim, under Fed.R.Civ.P. 12(b)(6), a court can hear outside evidence regarding a motion to dismiss for lack of subject matter jurisdiction.).

■ If the 12(b)(1) is a facial challenge, the pleadings are taken as true for the purposes of the motion. *See Jetform Corp. v. Unisys Corp.*, 11 F.Supp.2d 788, 789 (D.Va.1998) (holding that if the challenge is that the complaint fails to state sufficient facts to support subject matter jurisdiction the analysis is similar to a 12(b)(6) motion, whereby the facts in the complaint

are assumed to be true). However, if the movant challenges the existence of subject matter jurisdiction, the pleadings are treated as evidence on the issue.

Indeed, in this type of 12(b)(1) motion, the requirement is not unlike that for summary judgment, where the non-moving party cannot rest on the allegations in the complaint, but must present evidence to defeat the motion. *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320 (6th Cir. 1990); *Trentacosta v. Frontier Pacific Aircraft Indus., Inc.*, 813 F.2d 1553, 1558 (9th Cir.1987) (quoting Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1363 at 653–54 (1969)); *Tolan v. United States*, 176 F.R.D. 507, 510 (D.Pa.1998) (holding that the court may review evidence and resolve factual disputes regarding jurisdictional allegations in a 12(b)(1) motion).

■ The Defendant's Motion to Dismiss challenged the existence of subject matter jurisdiction, not simply the adequacy of the complaint's allegations. Under this analysis, there is no presumption of truthfulness of the Plaintiff's allegations, and the burden is on the Plaintiff to establish the Court's jurisdiction. *See Thornhill Publishing Co.*, 594 F.2d at 733 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3rd Cir.1977)).

### 2. DISCUSSION

■ As discussed in the Court's Order of July 7, 2002, the Defendant's Motion to Dismiss is premised on the Defendant's argument that the Court lacks subject matter jurisdiction in this case. Specifically, the Defendant argues that Plaintiff has failed to comply with the applicable statute of limitations under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–80.

Title 28 of the United States Code, section 2401(b) embodies the FTCA's statute of limitations and reads:

[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues . . . .

The Court takes judicial notice that Plaintiff filed its first administrative claim on December 31, 1998. (Complaint, ¶ 4(a)).

[6] How a claim "accrues" is governed by federal law. 28 U.S.C. § 2401(b). Federal law prescribes that a cause of action generally "accrues" at the time of injury or damage. *United States v. Kubrick*, 444 U.S. 111, 120, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). When it takes some time for the injury to become apparent, as here, federal courts apply the so-called discovery rule to determine accrual. A claim accrues either when the plaintiff knows, or could have exercised due diligence to know, the existence of the injury and its cause. *Id.* at 123, 100 S.Ct. 352. The standard is an objective one, with the cause of action accruing when a "reasonable person" would have discovered both the injury and the cause. *In re Swine Flu Products Liability Litigation*, 764 F.2d 637, 639 (9th Cir.1985).

In the Ninth Circuit, the issue as to when a claim accrues turns upon the particular facts and circumstances of each individual case. *See, e.g., Outman v. United States*, 890 F.2d 1050 (9th Cir.1989); *Simmons v. United States*, 805 F.2d 1363 (9th Cir.1986); *Fernandez v. United States*, 673 F.2d 269 (9th Cir.1982).

As laid out in the Court's July 7, 2002, Order, the important question to be answered is whether the Plaintiff's claim accrued upon an awareness that Plaintiff's

injuries could have been caused by exposure to TNT and DNT or did the Plaintiff's claim accrue upon the acquisition of more substantive findings. The answer to this question determines whether Plaintiff's claim was timely filed within the FTCA's two-year statute of limitations.

Defendant's argument can be summarized as follows: Plaintiff became sick in 1994. The Plaintiff's parents[1] testified that they learned of the contamination at the Monite Site in February of 1995. In 1995, Plaintiff and his parents were provided with notice as to the possible cause of his illness in the form of radio and television broadcasts, newspaper articles and notices, and flyers delivered door-to-door by the Defendant. The Defendant distributed a Toxicity and Risk of Contaminants Fact Sheet at a public meeting that Plaintiff's father attended. The Fact Sheet allegedly drew a direct correlation between blood injuries and the dangerous substances located at the Monite site. The Plaintiff's father, Ken Frasure, testified in a deposition that his suspicion ripened into knowledge of the cause of the Plaintiff's illness in March or April of 1995. In April of 1995, Ken Frasure consulted an attorney within three months of reading a February 1995 newspaper article. (Frasure Deposition 6:20–23, 8:16–19, 14:21–22; Kemp Deposition 37:9–40:9).

Defendant argues that the combination of the aforementioned events triggered the accruing of the two-year statute of limitations in 1995. Therefore, the Defendant argues that the Plaintiff's two years to file a claim had already run when Plaintiff filed his claim in 1998. Thus, Defendant argues that Plaintiff's claim is time-barred and, as a result, this Court does not have jurisdiction over this action. The Court disagrees.

---

1. The deposition of Plaintiff's mother (Lisa Kemp) is quite similar to the deposition of Plaintiff's father (Ken Frasure). The relevant portions of Lisa Kemp's deposition are 37:9–40:9.

Under the facts of this case, the suspicions of Plaintiff's parents as to the cause of his injury and their having consulted with an attorney are insufficient to start the statute running. In one case that addressed this issue, the court found that a plaintiff's suspicions as to the cause of his injury based on materials he had read combined with the act of retaining a lawyer were not sufficient to start the statute running. *Thompson v. United States,* 642 F.Supp. 762 (N.D.Ill.1986). The instant case bears a number of similarities to *Thompson.* Here, the Plaintiff's parents thought they might know what caused his injuries and they consulted an attorney to see if they had a cause of action. Without more than this, however, the Plaintiff's claim did not begin to accrue in 1995.

Defendant argues that there is more and points to a letter from two physicians Rajiv Bhatia, MD (Occupational Medical Resident) and Dennis Shusterman, MD (Attending Physician) to Marion Koerper, MD, dated October 4, 1995.[2] However, the Court finds that this letter is of no help to Defendant. The letter noted that the causal link between TNT and DNT exposure and bone marrow failure was uncertain. The letter provides, in part:

Overall from the view of causation, a comparison of exposure intensity and duration, as well as an analysis of any modifying effect that Justin's renal failure may have had on metabolism and elimination, would be necessary before further speculating on any etiologic connection between Justin's marrow aplasia and his exposure to trinitrotoluene (and other nitro-aromatics).

(Exh. U, page 5, Opposition).

Also in 1995, one of Plaintiff's doctors, Dr. Pokroy, advised Plaintiff that he was unconvinced of the causal link between the Plaintiff's bone marrow failure and Plaintiff's exposure to TNT and DNT. In 1995, Plaintiff's parents' awareness was heightened by media reports that the cause of injuries such as Plaintiff's could be related to TNT or DNT exposure. However, Plaintiff claims that he and his parents did not have the requisite knowledge that the DNT caused his bone marrow to fail until Plaintiff consulted Dr. Alan Levin in 1998.

Defendant has grasped upon Plaintiff's claim and language in the Court's previous Order to support Defendant's motion. In its Motion to Reconsider, the Defendant phrases its argument in the following terms: "The Court held that Plaintiff's claim did not accrue until he was informed definitively by a medical expert of the causal link between the hazardous material found at the Monite Site and his bone marrow failure." Defendant's characterization of the Court's holding is self-serving and off the mark.

The Court did hold that the Plaintiff's claim began to accrue when Dr. Levin made his diagnosis that there was a "causal link" between the Plaintiff's illness and the exposure to DNT. However, this is something altogether different than Defendant's assertion that the Court concluded Plaintiff's cause could not accrue until Plaintiff was informed "definitively" of a causal link, which implies one must know definitively the cause of one's malady before the statute of limitations begins to accrue. Such a result was not expressed or implied in the Court's Order. Nevertheless, under the particular facts of this case, Plaintiff's claim did not begin to accrue until Dr. Levin informed him of the probability of the link between the toxins

---

**2.** Plaintiff was referred to Dr. Bhatia and Dr. Shusterman by Dr. Koerper in 1995. Dr. Bhatia and Dr. Shusterman practice at the Occupational Medicine Clinic, University of California, San Francisco.

at the Monite Site and the Plaintiff's illness.

The standard is clear that a claim arises, and thus begins to accrue, when a reasonable person would have discovered both the injury and the cause. Under the facts of the instant case, a reasonable person would have discovered the cause of Plaintiff's injuries when Dr. Levin made his diagnosis. None of the doctors with whom Justin had previously consulted drew a sufficient link between the Plaintiff's illness and the TNT and DNT at the Monite Site. For example, from 1995 to 1997, Dr. Pokroy advised the Plaintiff that he was not convinced of a causal link between Plaintiff's bone marrow failure and his exposure to TNT/DNT.

The Defendant takes issue with Doctor Pokroy's findings. Defendant argues that under *Kubrick* the Plaintiff is not protected if he fails to "bring suit because he is incompetently or mistakenly told that he does not have a case ..." *Kubrick,* 444 U.S. at 124, 100 S.Ct. 352. However this argument is based on a seemingly false premise. Neither has there been evidence presented to this Court, nor has it been suggested that Dr. Pokroy was, in any way, incompetent or mistaken in his findings regarding the cause of Plaintiff's condition. He merely could not determine a causal link at that point in time.

Dr. Pokroy, who went to numerous medical libraries seeking information on the possible cause of Plaintiff's illness, found only two articles, from the 1940s, that suggested a possible link between the type of dangerous substances which were present at the Monite Site, and the Plaintiff's illness. The doctor was uncertain that these substances were related to the Plaintiff's illness. Nor did any of the other doctors who examined the Plaintiff come forth with an unequivocal or even strong opinion that the two were related until Dr. Levin made such a determination in 1998.

A similar situation to the instant case took place in *Knaps v. B & B Chem. Co., Inc.,* 828 F.2d 1138, 1139 (5th Cir.1987). In *Knaps,* the plaintiff suspected that a type of soap he used at his place of employment caused his skin disorder. The plaintiff sought medical advice on the cause of his disorder. None of his doctors determined a causal connection to the soap. *Id.* Plaintiff eventually filed a claim. However, the trial court granted summary judgment in favor of the defendant under the statute of limitations. *Id.* The Fifth Circuit reversed the ruling, finding that "[w]e cannot say, as a matter of law, that an injured party acts unreasonably by delaying a lawsuit because the party's doctors consistently deny that a suit would be justified." *Id.* at 1140.

In the instant case, Plaintiff sought medical advice regarding his condition. None of Plaintiff's doctors drew a sufficient causal link between his illness and the DNT. Plaintiff was not unreasonably delaying this action. To the contrary, Plaintiff was actively seeking the source of his illness.

Defendant's Motion to Reconsider points out that in the Bhatia–Shusterman letter of October 4, 1995, the doctors opined that it "is biologically plausible that trinitrotoluene could have caused [Plaintiff's] bone marrow failure given sufficient exposure." However, the doctors also noted that "from the view of causation, a comparison of exposure intensity and duration, as well as an analysis of any modifying effect that [Plaintiff's] renal failure may have had on metabolism and elimination, would be necessary before **further speculating on any etiological connection** between [Plaintiff's] marrow aplasia and his exposure to trinitroluene (and other nitro-aromatics)." (Emphasis added).

When the doctors were informed of the presence of trinitrotoluene at the Monite Site, they essentially came to the conclu-

sion that TNT and/or DNT could not be ruled out as a potential cause of Plaintiff's illness. Contrary to Defendant's assertions that information of this sort places a plaintiff on notice that he has a cause of action, this is merely, in the words of the doctors who wrote the letter, speculation.

Defendant makes much of the fact that when Plaintiff's parents gave depositions in this case, they stated that they thought that the Monite site could be the cause of Plaintiff's condition. The record in this case, however, clearly indicates that numerous visits to physicians failed to substantiate these suspicions. There are a number of cases that are helpful in determining when a plaintiff is on notice that he or she has a cause of action.

In *Stoleson v. United States,* 629 F.2d 1265, 1266 (7th Cir.1980), the plaintiff suffered medical problems she suspected were related to the nitroglycerin to which she was exposed at the munitions plant where she worked. She also read a newspaper article that suggested a possible link between her health problems and exposure to nitroglycerin. *Id.* Several of plaintiff's doctors denied any relationship between her maladies and the chemical exposure. Eventually, however, one doctor drew a connection between the exposure and the illness. When the plaintiff filed a claim the district court determined that the case was time barred and dismissed it.

On appeal, the Seventh Circuit reversed the trial court, finding that only after the link between the plaintiff's symptoms and nitroglycerin was documented did she have the requisite knowledge of causation. *Id.* at 1270–71. The court found plaintiff's suspicions were not enough to trigger the limitations period, because "[a] layman's subjective belief, regardless of its sincerity or ultimate vindication, is patently inadequate to go to the trier of fact." *Id.* at 1270. The instant case presents a similar set of facts. The Plaintiff's parents

thought they knew what the cause of his illness was. However, their layman's subjective belief was not enough to trigger the limitations period.

Some courts have held differently than *Stoleson* and *Thompson.* These courts have held that the limitations period is triggered when a plaintiff is on notice that a substance is the likely cause of the injury. *See, e.g., Fidler v. Eastman Kodak Co.,* 714 F.2d 192, 198 (1st Cir.1983). Similarly, in *Dawson v. Eli Lilly & Co.,* 543 F.Supp. 1330, 1334 (D.D.C.1982), the court rejected the plaintiff's claim that "clear and certain knowledge" of causation was required. The Court finds that these cases, although instructive, are distinguishable from the instant case.

Based on the inconclusive and inconsistent diagnoses Plaintiff received until 1998, it is a reasonable conclusion that his parents did not have sufficient knowledge of the probable cause of Plaintiff's illness until then. *See Helinski v. Appleton Papers,* 952 F.Supp. 266 (D.Md.1997) (holding that while no physicians ruled out the chemical as a cause of plaintiff's injuries, nobody provided plaintiff with information making the chemical the probable cause, rather than a possible cause of her illness). The layman's beliefs held by the Plaintiff's parents regarding the cause of his illness and the hiring of an attorney are insufficient under the facts of this case to trigger the accruing of the statute. The Court finds that Plaintiff's case did not begin to accrue until he consulted with Dr. Alan Levin in 1998.

Because Plaintiff filed suit within two years of the accrual of his claim, the Court's initial decision did not contain clear error. Plaintiff's suit was timely filed and the motion to dismiss was correctly denied under either the 12(b)(1) standard or the 12(b)(6) standard. There-

fore, the Defendant's Motion to Reconsider will be denied.

### III. MOTION TO DISMISS OR IN THE ALTERNATIVE SUMMARY JUDGMENT

Defendant's second Motion to Dismiss (Docket # 26) moves the Court to dismiss Plaintiff's Complaint for lack of subject matter jurisdiction on the ground that the allegations in his Complaint are barred by the discretionary function exception to jurisdiction under the Federal Torts Claims Act. In the alternative, the Defendant requests the Court grant summary judgment in favor of Defendant on the discretionary function exception issue, and argues that there are no issues of material fact.

#### 1. BASIS FOR MOTION

As stated above, the Defendant argues that the Court lacks subject matter jurisdiction. The standard for a 12(b)(1) motion to dismiss is set out in the previous section.

#### 2. DISCUSSION

Defendant argues in its Motion to Dismiss that Plaintiff's claims "taken in their best light, amount to nothing more than accusations that the [Defendant] should have taken some action that it omitted to take" in relation to the Monite Site, i.e., "to discover or disclose the hazardous materials released at the Monite Site." Further, Defendant takes the position that any such action or inaction by Defendant would fall within the discretionary function of the agency involved; in this case the Bureau of Land Management. If the Defendant were correct in its analysis of this case, then the Defendant would be shielded from tort liability by the discretionary function exception and the Court would not have jurisdiction under the FTCA.

The FTCA contains the discretionary function exception at 28 U.S.C. 2680(a).

Section 2680(a) provides that the United States does not waive its sovereign immunity for:

> [a]ny claim … based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

The Court follows a two-step test to assess the applicability of the discretionary function exception. *Gager v. United States,* 149 F.3d 918, 920 (9th Cir.1998). First, "[t]he exception covers only acts that are discretionary in nature, acts that 'involv[e] an element of judgment or choice.'" *United States v. Gaubert,* 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (quoting *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531, (1988)). This requirement of judgment or choice is not satisfied if a federal statute, regulation, or policy requires a particular course of action. *See id.* at 322, 111 S.Ct. 1267. Second, the discretion exercised must be "'of the kind that the discretionary function exception was designed to shield.'" *Id.* at 321–22, 111 S.Ct. 1267, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (quoting *Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954). The judgments and choices entitled to protection are those "grounded in social, economic, and political policy." *United States v. Varig Airlines,* 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).

The first question to be addressed is whether the acts or omissions in question in this case were discretionary. Plaintiff argues that Defendant failed to perform or negligently performed mandatory environmental assessments, environmental impact statements, and record searches. Plaintiff further argues that even if these functions were discretionary, they are not

the kind of discretionary function the exception was designed to shield.

Plaintiff argues that Defendant was obligated to perform an environmental assessment upon application of the City of Sparks to lease the Monite Site. Defendant states that an environmental assessment was completed. If the environmental assessment was discretionary, any tort resulting from the BLM's alleged negligent performance of the assessment, would not be actionable. If the environmental assessment was mandatory, however, the discretionary function exemption would not apply.

Defendant contends that the environmental assessment was completed and, thus, there can be no liability if it were negligently performed. Apparently, Defendant is arguing that the environmental impact statement was discretionary. Plaintiff argues that it was mandatory. However, the record is unclear on this matter. Neither the Plaintiff nor the Defendant has provided the Court with either statutory or regulatory authority regarding whether the environmental assessment was mandatory.

What is clear, however, is that once the environmental assessment was completed, it might have triggered a mandatory environmental impact statement. The record indicates that documents[3] in the Defendant's possession disclosed that a dynamite factory was operated on the premises for many years and that hazardous substances were stored on the premises for more than one year. If such substances were stored on the site for more than one year, the environmental impact statement would have been mandatory and Defendant would have no protection from the discretionary function doctrine. Plaintiff has made a sufficient showing that the environmental impact statement were indeed mandatory.

Plaintiff also makes strong arguments that other acts by the Defendant were not discretionary and, as a result, Defendant should not be shielded from liability for negligently performing such acts. Plaintiff argues that a mandatory record search was performed negligently and the Defendant failed to adequately and expeditiously assess the Monite Site after the dangerous substances were discovered. In its reply memorandum, the Defendant argues that even if the records search was done "inadequately, it is protected conduct under the discretionary function exception." However, Defendant neither explains how this is the case nor offers any legal support for the position. The position is untenable as stated. Defendant admits that the record search was required. If the act is not discretionary, the exception does not apply. *United States v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). Thus, it is hard to see how the record search was protected under the discretionary function exception.

Assuming, however, that some or all of the Defendants alleged acts or omissions were discretionary, they still must be of the kind that the discretionary function exception was designed to shield. Thus, the second question to be answered is whether the alleged discretionary functions exercised by the Defendant were of this ilk.

Plaintiff has pointed the Court's attention to two interesting cases. Both cases have a strong application to the instant case. First, in *Seyler v. United States*, 832 F.2d 120 (9th Cir.1987), a motorcyclist was injured on an Indian reservation roadway and sued the Bureau of Indian Affairs alleging negligence deriving from lack of

---

**3.** 1978 Land Report and 1972 Letter from Lillian Barlow.

sufficient signs on the roadway. The district court granted summary judgment in favor of the defendant. The Ninth Circuit reversed the district court's summary judgment decision, finding that it "doubt[ed] that any decision not to provide adequate signs would be of the nature and quality that Congress intended to shield from tort liability." *Seyler*, 832 F.2d at 123 (internal quotations and citation omitted). Second, in *W.C. & A.N. Miller Companies v. United States*, 963 F.Supp. 1231 (D.D.C.1997), a landowner sued the government after discovering that the U.S. Army had buried munitions and other dangerous materials on land he had purchased from the government. The court ruled that the failure to warn of the buried munitions was "not the type of decision that involves social, economic, or policy considerations."

In the instant case, there are serious questions regarding whether some of the Defendant's actions or omissions were of the nature and quality that Congress intended to be shielded from liability. Like the defendants' actions or omissions in *Seyler* and *W.C. & A.N. Miller Co.*, many of the Defendant's actions taken regarding the assessment of the Monite Site and providing the public with sufficient warning and protection do not appear to be the type of actions or omissions considered by Congress when it passed the statute.

Although the Plaintiff bears the initial burden of proving subject matter jurisdiction, the Defendant "bears the ultimate burden of proving the applicability of the discretionary function exception." *Faber v. United States*, 56 F.3d 1122, 1124 (9th Cir.1995). Here, the Plaintiff has met his initial burden proving subject matter jurisdiction. However, the Defendant has not met its burden proving the applicability of the discretionary function exception. Accordingly, Defendant's Motion to Dismiss will be denied. In light of this, there is no need to discuss the Defendant's request for summary judgment on this same issue. However, it should be noted that there are issues of material fact that would defeat Defendant's Motion for Summary Judgment.

## IV. MOTION FOR SUMMARY JUDGMENT

### A. BASIS FOR MOTION

Defendant has filed a second summary judgment motion (Docket # 27), predicated on Nevada's recreational use statute. The Defendant contends that no liability can be imposed on it under the circumstances of this case because the operation of Nevada's "recreational use" statute insulates it from liability. Accordingly, Defendant argues that summary judgment should be entered in its favor.

### B. STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment is a procedure that terminates, without a trial, actions in which "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A summary judgment motion may be made in reliance on the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." *Id.*

The movant is entitled to summary judgment if the nonmoving party, who bears the burden of persuasion, fails to designate " 'specific facts showing that there is a genuine issue for trial.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 56(e)). Thus, to preclude a grant of summary judgment, the nonmoving party must set forth " 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106

S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). The substantive law defines which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All justifiable inferences must be viewed in the light most favorable to the nonmoving party. *County of Tuolumne v. Sonora Cmty. Hosp.,* 236 F.3d 1148, 1154 (9th Cir.2001) (citing *Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. 1348).

Although the nonmoving party has the burden of persuasion, the party moving for summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. *Metro Indus., Inc. v. Sammi Corp.,* 82 F.3d 839, 847 (9th Cir.1996). That burden is met by showing an absence of evidence to support the nonmoving party's case. *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. 2548. The burden then shifts to the nonmoving party to set forth specific facts demonstrating that there is a genuine issue for trial. *Liberty Lobby, Inc.,* 477 U.S. at 250, 106 S.Ct. 2505. In meeting this burden, the nonmoving party must go "beyond the pleadings and by its own evidence present specific facts showing that there is a genuine issue for trial." *Far Out Prods. v. Oskar,* 247 F.3d 986, 997 (9th Cir.2001) (citing *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir.1996)) (internal quotations omitted).

## C. DISCUSSION

Defendant contends that no liability can be imposed on it in this case because Nevada's "recreational use" statute insulates it from liability. Nevada's recreational use statute provides that:

> ... an owner of any estate or interest in any premises ... owes no duty to keep the premises safe for entry or use by others for participating in any recreational activity, or to give warning of any hazardous condition, activity or use

of any structure on the premises to persons entering for those purposes.

Nev.Rev.Stat. § 41.510

Defendant contends that the Monite Site is the type of land contemplated by the statute. Defendant further contends Plaintiff was using the Monite site for recreational purposes. Therefore, according to Defendant, it was relieved of any liability to keep the premises safe or to warn of hazards.

 Thus, the first question is whether the land where Plaintiff played could be characterized as the type of land that was intended to be covered by the statute. "Although the Nevada [recreational use] statute does not specify what type of property is covered, the intent of the legislature is that the property should be rural, semi-rural, or nonresidential so that it can be used for recreation." *Boland v. Nevada Rock And Sand Co.,* 111 Nev. 608, 612, 894 P.2d 988 (1995). The Monite Site, a semi-rural piece of land adjacent to a residential area, appears on the surface to be the type of land intended to be covered by the statute.

The second question is whether Plaintiff's use of the Monite Site was for recreational purposes. Plaintiff acknowledges that he played in the area of the Monite Site between 1992 and mid–1994 and Plaintiff's use of the property could certainly be characterized as recreational activity.[4] Therefore, the Defendant appears to be immune unless one of the exceptions to the Nevada recreational use statute applies.

 Subsection 3 of the Nevada recreational use statute provides that the statute immunizes landowners from liability unless the defendant willfully or maliciously failed to guard or to warn against a

---

4. Riding his bike, playing, digging and hiking.

dangerous condition, use, structure or activity. *See* NRS 41.510(3)(a)(1). The issue of willfulness is "generally a question of fact." *Boland,* 111 Nev. at 613, 894 P.2d 988.

In its Motion for Summary Judgment, Defendant states, without real argument, that none of the exceptions to the statute apply to this case. Plaintiff argues that an exception does apply to this case and that genuine issues of material fact exist regarding Defendant's alleged willful conduct.

■ Judge Edward C. Reed of this court has developed a three-pronged test to determine whether a landowner willfully failed to guard or warn against a dangerous condition. The test, which this judge also adopts, asks whether the landowner had: "(1) actual or constructive knowledge of the peril to be apprehended, (2) actual or constructive knowledge that injury is a probable, as opposed to a possible, result of the danger, and (3) conscious failure to act to avoid the peril." *Neal v. Bently Nevada Corp.,* 771 F.Supp. 1068, 1073 (D.Nev.1991), *aff'd,* 5 F.3d 538 (9th Cir. 1993).

### a. Actual or Constructive Knowledge

■ Defendant asserts that it had no actual or constructive knowledge of the dangerous toxins at the Monite Site. The record before the Court, however, indicates that this might not be the case. The Defendant owned the Monite Site before, during and after the explosives factory was operated on that land. While it's true that others may have occupied the land at various times, the land belonged to the Defendant and came under its control again in the 1970s. In 1992, children playing at the Monite Site found a 30–gallon drum containing 320 lbs. of DNT. Therefore, Defendant had actual knowledge that the Monite Site contained hazardous materials by, at least, 1992.

Had Defendant checked its files, it would have found a letter from 1978, in which the daughter of a previous occupier of the land documented the underground storage of dynamite and the burying of garbage at the Monite Site. Defendant claims it was unaware of the letter in its records. However, Defendant cannot be a poor record keeper and then later use the lack of institutional records as a shield from liability. The fact that the Defendant knew that the Monite Site was used as a dynamite factory, combined with the 1978 letter, should have put the Defendant on notice that it was likely that hazardous substances could be present at the Monite Site. When, in 1992, Defendant became aware of the barrel of DNT, the likely presence of hazardous substances on the Site was even more evident.

Plaintiff makes a strong case that Defendant had constructive knowledge that dangerous substances existed at the site. To determine constructive knowledge, the Court uses an objective standard. "Would a reasonable person under the same or similar circumstances as those faced by the actor be aware of the dangerous character of the conduct." *Neal v. Bently Nevada Corp.* 771 F.Supp. 1068, 1073 (D.Nev.1991)(internal quotations and punctuation omitted).

A reasonable jury could find that a reasonable person in the Defendant's shoes had constructive knowledge that there were hazardous materials and toxins at the Monite Site. Indeed, Plaintiff has set forth specific facts from which a reasonable jury could infer Defendant's constructive knowledge of the toxins present at the Site.

### b. Knowledge of Probability of Injury

Defendant appears to have been on notice that injury would probably result from contact with the DNT. Defendant was cer-

tainly aware of the probable harm that could be caused by the DNT. In fact, Defendant distributed a Toxicity and Risk of Contaminants Fact Sheet at a public meeting that Plaintiff's father attended. Moreover, as of 1993, the Defendant was certainly aware of the dangers present and their probable risk of injury and exhibited such by posting signs and fencing the area. Additionally, the Defendant's own hazardous materials specialist determined that the Site was high risk. Thus, at a minimum, there is a question of fact whether the Defendant had actual or constructive knowledge that injury was a probable result of the DNT at the Monite Site.

### c. Conscious Failure to Act

The Defendant argues that after "discovery and the investigation that led to the conclusion that the Site was contaminated, the undisputed facts are that the government vigorously acted to avoid the peril." However, following the 1992 discovery of DNT at the Monite Site, Defendant's hazardous materials specialist Clyde Murray testified in a deposition that he had reasons to believe that there was more contamination at the Monite Site. He further testified that an immediate investigation was warranted. However, the available facts indicate that the Monite Site may not have been treated with the urgency that the situation warranted.

In 1994, children again found DNT at the Monite Site; this time in the form of a 3.5 lb. crystal. The crystal was found outside of the fenced area. In the interval between the 1992 and the 1994 DNT finds, it appears from the available facts that the Defendant may not have adequately fenced the site or warned of its danger. Defendant argues that it inspected the Monite Site, fenced the area where the barrel was found, and had no reason to believe there was more DNT present. In fact, it appears from the record that it took Defendant nearly a year to adequately test soil samples and erect a fence after the first DNT find.

A reasonable jury could find that the Defendant knew, or should have known, that a dangerous condition was present at the Monite Site. A reasonable jury could also find that the Defendant knew or should have known that injury to the public was probable. Additionally, it appears that Defendant may have consciously failed to act. In sum, there is a clear question of fact regarding whether the Defendant acted willfully through its acts and omissions regarding the Monite Site.

Finally, although the land where the Monite Site is located appears to generally be of the kind contemplated by the Nevada recreational use statute, there is a question whether Nevada's recreational use statute would even apply to this case. That is, ruins of a munitions factory polluted with dangerous substances 10,000 times higher than acceptable levels and known to be frequented by children and other innocent users who resided nearby hardly seems like the type of land contemplated by the Nevada Legislature as suitable for recreation. As has been recognized by the Ninth Circuit Court of Appeals, Nevada's recreational use statute is in derogation of the common law rules of tort liability. As such, care should be taken to avoid an overbroad and unintended interpretation of the statute. *Ducey v. United States*, 713 F.2d 504 (9TH Cir.1983). "[E]xceptions to the statute . . . must be given the broadest reading that is within the fair intendment of the language used." *Id.* at 510. (Emphasis in original.) If Nevada's recreational use statute is to be applied under the facts of this case, at the very least, the exceptions to the statute must be liberally applied. Defendant's Motion for Summary Judgment will be denied.

## V. CONCLUSION

For the forgoing reasons, the Defendant's Motion to Dismiss or in the alternative for Summary Judgment (Docket # 26) is **DENIED**. The Defendant's Motion for Summary Judgment (Docket # 27) is **DENIED**. The Defendant's Motion to Reconsider (Docket # 28) is **DENIED**.

**IT IS SO ORDERED.**